UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:07-CR-59-FL

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| ALAN ANDREW GOOCH, | ) | |
| | ) | |
| Defendant. | ) | |

This case comes before the court on motion by defendant Alan Andrew Gooch ("defendant") to suppress all evidence obtained as a result of the felony stop of the vehicle in which defendant was a passenger on 15 January 2007, including subsequent statements made by defendant regarding his ownership of a seized firearm [DE #12-1]. The government filed a response in opposition [DE #13-1]. The motion was referred to the undersigned Magistrate Judge for memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). On 9 May 2007, the undersigned held a hearing on the motion. For the reasons stated below, defendant's motion should be denied.

## I. PROCEDURAL BACKGROUND

On 7 March 2007, defendant was charged in a one-count indictment [DE #1] with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924. The charges arise from the vehicle stop of 15 January 2007, seizure of a firearm found in the vehicle, and subsequent statements made by defendant admitting ownership of the firearm.

## II. FACTUAL BACKGROUND[1]

On the evening of 14 January 2007 and early morning of 15 January 2007, seven members of the Raleigh Police Department were patrolling an area of downtown Raleigh in the vicinity of the

---

[1] The court bases its factual determinations on the testimony and exhibits admitted at the hearing, and the exhibits accompanying the opposing memorandum.

Big Apple nightclub ("nightclub") pursuant to a special project. (Transcript of Hearing ("Tr.") 6-7). The project was in response to a high number of recent city code violations primarily relating to alcohol incidents, as well as several robberies and a shooting. (*Id.* 7). The visibility that evening was good due to several street lights illuminating the area. (*Id.* 31).

### A. Citation of Venable

Officer J.R. Moore ("Moore"), who has worked for the Raleigh Police Department for three years, was on duty that evening and participating in the special project. (*Id.* 36-37). Moore was assigned to the perimeter unit, such that when an officer close to the nightclub would see a violation, Moore would respond by driving his marked patrol car to the scene of the violation to investigate and possibly issue a warning or citation. (*Id.* 37).

On 15 January 2007, just after midnight, Moore was notified by radio that a man was urinating in public by a parked vehicle. (*Id.* 37-38). Moore responded and met with the man, who identified himself as Carleak Venable ("Venable"). (*Id.* 38, 40). Venable had been urinating in a parking lot, approximately thirty feet from the nightclub. (*Id.* 38, 44). Two other individuals were with Venable, and they began to question Moore about why he was bothering them. (*Id.* 38). After Moore told the other individuals they needed to leave, Venable himself told his companions to go into the nightclub and that he would meet them inside. (*Id.*). Moore asked Venable for identification, which Venable was unable to produce. (*Id.* 45). Venable then stated that he did not want any trouble. (*Id.* 38). Moore began writing Venable a citation for public urination. (*Id.* 39). While writing the citation, Moore asked Venable if he had ever been arrested. (*Id.*). Venable responded affirmatively, but was hesitant to indicate why he had been arrested. (*Id.*). When pressed by Moore, Venable stated that he had just been released from "prison" the previous Monday for "'stupid shit,

2

you know, breaking into stuff, things like that.'" (Moore Report [DE #13-3], p.1; *see* Tr. 39-40 (Moore's hearing testimony to same effect). Moore completed writing the citation, handed it to Venable, and returned to his perimeter position. (*Id.* 40).

### B. Discovery of Firearm in Van

Officer J.S. Wood ("Wood"), a seven and one-half year veteran of the Raleigh Police Department, was also participating in the special project near the nightclub on the evening of 14 January 2007 and early morning of 15 January 2007. (Tr. 6). Wood was positioned close to the front door of the nightclub, performing surveillance of the area. (*Id.* 6-7). Wood was also walking through the parking lot adjacent to the nightclub looking into the windows of parked vehicles for guns and contraband. (*Id.* 7). At approximately 2:30 a.m., Wood looked into the front passenger side window of a Chrysler Town and Country van and, using his flashlight, saw the end of a handgun in a drawer under the front passenger seat. (*Id.* 8, 18; Wood Report [DE #13-2], p. 1). The drawer, which only opens from the front, was open approximately one inch enabling Wood to see the rear of the handgun's slide and a portion of the handgrip. (Tr. 8).

Upon seeing the handgun, Wood radioed Sergeant Hess ("Hess"), who came to the van and verified that what Wood saw was in fact a handgun. (*Id.*). While Hess kept watch on the van, Wood continued to look inside the remaining vehicles in the parking lot. (*Id.* 9). Wood then returned to his surveillance position and was able to see the van from his position. (*Id.*).

### C. Observation of Venable Entering Van

At approximately 2:50 a.m., Wood saw three males approach the van–one walked to the driver's side and two walked to the passenger side. (Tr. 9-10). At this point Moore, who apparently was able to see the van from his perimeter position, alerted all of the officers on the project that one

3

of the three men at the van was Venable. (*Id.* 10-11, 40-41). Moore relayed that he had cited Venable earlier that evening and that Venable had admitted to being in prison for breaking into things. (*Id.* 11, 41). Both Moore and Wood interpreted Venable's use of the word "prison" to mean that Venable had been convicted of felony breaking and entering. (*Id.* 11, 22-23, 41, 45).

Based on that information, either Wood or Hess decided to prepare for a felony vehicle stop of the van.[2] (*Id.* 13, 33). The officers radioed to each other and decided on a well-lit intersection not far from the nightclub as the location for the stop. (*Id.* 14). Wood testified that the reason the officers did not stop Venable before he departed in the van was concern for safety. (*Id.* 29). There were a number of individuals in the area around the van, and because the officers knew that a firearm was in the van, they wanted to ensure that innocent bystanders were not harmed during the stop. (*Id.*).

During preparation for the vehicle stop, Venable and the other two males, later identified as Clayton Batchelor ("Batchelor") and defendant, began talking to three females who were standing about two car lengths away from the van. (*Id.* 11-12, 21-22, 42). Batchelor walked within a few feet of the females, while Venable and defendant remained on the passenger side of the van. (*Id.* 12, 22). The passenger side sliding door of the van was open and Venable was hanging on the side of the van, with one foot in the doorjamb and his hands on the roof. (*Id.* 22). There is a conflict as to whether Venable and defendant merely stood outside of the van or whether they went in and out of the van several times during this period. (*Compare id.* 22, 42 *with* Wood Report, p. 2). However, Moore and Wood did not see anyone move the handgun or transfer it to anyone outside the van. (Tr. 33-34, 42-43). Approximately five minutes after the three men arrived at the van, they entered it and left.

---

[2] Wood could not recall who made the decision to initiate a felony stop of the van. (Tr. 33).

4

(*Id.* 12-13, 43). Batchelor drove, defendant sat in the front passenger seat, and Venable sat in the rear passenger seat behind defendant. (*Id.* 14-15).

### D. Felony Vehicle Stop

The officers followed the van in their marked vehicles and initiated the felony vehicle stop at the intersection they had previously selected. (Tr. 14, 16). Using the loud speaker from one of their patrol cars, the police directed the occupants of the van to exit the vehicle one at a time, beginning with Batchelor, followed by defendant, and then Venable. (*Id.* 14-15). The three men were handcuffed, searched, and placed into the back seats of different patrol cars. (*Id.* 15). Batchelor commented that the van belonged to his wife. (*Id.* 43-44). A search of the van yielded the handgun previously seen by Wood and Hess; however, the handgun had been moved to the floorboard behind the front passenger seat. (*Id.*). The handgun was fully loaded, with one round in the chamber and ten rounds in the magazine. (Wood Report, p. 2). The serial numbers on the handgun were obliterated. (Tr. 16). An additional .45 caliber round was found in the front passenger seat. (Wood Report, p. 2). During a subsequent interview at the police station, defendant admitted that the handgun belonged to him. (Def.'s Mot., p. 2; Wood Report, p. 3).

## III. DISCUSSION

The parties agree that because defendant was merely a passenger in the van that was stopped he had no reasonable expectation of privacy in the items found in the van and cannot contest the search of the van. *United States v. Rusher*, 966 F.2d 868, 874 (4th Cir. 1992). Defendant can and does, however, contest the initial stop of the van. *Id.* at 874 n. 4. He does so on the grounds that the police officers lacked reasonable suspicion to make the stop, as required by *Terry v. Ohio*, 392 U.S. 1 (1968).

The court disagrees. In satisfaction of the *Terry* standard, the officers had a reasonable, articulable suspicion that Venable was committing or was about to commit a crime–namely, the federal and North Carolina felony of possession of a firearm by a felon. *See* 18 U.S.C. §§ 922(g)(1), 924(a)(2); N.C.G.S. § 14-415.1. More specifically, there was reasonable suspicion (1) that Venable had previously been convicted of a felony and (2) that he knowingly possessed or would knowingly possess a firearm. Status as a felon and knowing possession of a firearm are the principal elements of the federal and North Carolina crime of firearm possession by a felon.[3] *See United States v. Langley*, 62 F.3d 602, 606 (4th Cir. 1995) (stating elements of federal offense); N.C. Pattern Jury Inst. 104.41 (actual-constructive possession), 254A.11(possession of a firearm). Each of these aspects of reasonable suspicion in this case is examined below after a review of the reasonable suspicion standard.

## A. Standard

Under the standard set forth in *Terry*, a law enforcement officer may stop an individual for further investigation if the officer has a reasonable, articulable suspicion that "criminal activity *may be* afoot." 392 U.S. at 30 (emphasis added). The standard of *Terry* has been interpreted to allow law enforcement officers to make vehicle stops based on reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

---

[3]Notwithstanding these fundamental similarities in the federal and state offenses, there are a number of differences between them. For example, the federal statute does not speak of felonies per se, but crimes punishable by imprisonment for a term exceeding one year, 18U.S.C. § 922(g)(1), whereas the North Carolina statute covers felony convictions in the state as well as substantially similar violations in other jurisdictions punishable by imprisonment for a term exceeding one year, N.C.G.S. § 14-415.1(b). As a further example, the federal statute includes the element, not found in the state statute, that the possession be in or affecting interstate commerce. 18 U.S.C. § 922(g)(1). The differences in the federal and state offenses are not material for purposes of the instant analysis given the facts of this case and the nontechnical nature of the reasonable suspicion standard.

Reasonable suspicion is less than probable cause, but it does require a "minimal level of objective justification for making the [*Terry*] stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The court must look at the totality of the circumstances to determine whether reasonable suspicion exists. *United States v. Foreman*, 369 F.3d 776, 785 (4th Cir. 2004). In making this determination, the court must draw its conclusions from the viewpoint of a reasonable, experienced law enforcement officer. *Arvizu*, 534 U.S. at 273 (in determining reasonable suspicion, courts must consider law enforcement officers' "experience and specialized training to make inferences from and deductions about the cumulative information available to them.")

The *Terry* standard does not require law enforcement officers to have reasonable suspicion of *ongoing* criminal activity. *United States v. Perkins*, 363 F.3d 317, 326 (4th Cir. 2004) (emphasis added). Indeed, the purpose of *Terry* is to allow officers to investigate a situation based on their suspicions with the goal of preventing *future* criminal activity. *Id.* This distinction highlights a critical difference between reasonable suspicion and probable cause: "whereas probable cause looks for past or present illegalities, an underlying purpose of *Terry* is to grant officers the ability to prevent future wrongdoing." *Id.* at 327. Such was the case in *Terry*, where a police officer observed conduct that by itself was not illegal–namely, defendant and another man pacing back and forth in front of a store. 392 U.S. at 22-23. However, the officer's experience led him to reasonably believe that defendant was planning to rob the store. *Id.* at 22-23.

## B. Reasonable Suspicion that Venable Was a Felon

Applying these principles to the record in this case, it is apparent that there are a number of specific, articulable facts which created a reasonable suspicion that Venable was a felon. First, after Moore approached Venable, Venable sent his noisy friends on into the nightclub (Tr. 38). Venable's

7

action suggested that he was eager to minimize the risk of complicating the situation and getting into more trouble. Venable himself later told Moore that he did not want any trouble, a statement reasonably associated with a person who had previously had run-ins with the law. (*Id.*).

In addition, Venable hesitated before responding to Moore's question about why he had been arrested in the past. (*Id.* 39). This apparent reluctance by Venable to answer suggested that the prior arrests may have been for something more than minor offenses.

Most importantly, however, Venable told Moore that he had just been released from "prison" and that he had been there for some type of breaking and entering offense. (Moore Report, p. 1; *see* Tr. 39-40). Moore subsequently informed Wood, along with the other officers on patrol that evening, about these disclosures. (Tr. 40-41). Both Wood and Moore testified that, based on their experience, when a person says that he has been to prison the statement means the person has been convicted of a felony. (*Id.* 11, 41). In contrast, according to Moore, if a person states that he has been to jail the statement indicates the person has been convicted of a misdemeanor. (*Id.* 45). Wood further testified that in his experience as a police officer he has never come into contact with a person who has been sent to prison for a misdemeanor. (*Id.* 11).

The officers' assumption that Venable's reference to "prison" indicated that he was a convicted felon is reasonable in light of North Carolina law. *See also* N.C.G.S. § 14-1(3) ("A felony is a crime which . . . [i]s or may be punishable by imprisonment in the State's prison . . . ."); *State v. Willis*, 121 S.E. 2d 854, 857, 255 N.C. 473, 478 (1961) (misdemeanors are punished as at common law, "that is, by fine or imprisonment in the county jail, or both."). Although it is possible for a person convicted of a misdemeanor in North Carolina to serve time in prison, based on North

Carolina's structured sentencing scheme, it would not be commonplace.[4] *See* N.C.G.S. §§ 15A-1352(a), -1340.23(c).

Additionally, Venable's statement that he was in prison for "'breaking into stuff'" provided further justification for the officers' suspecting that the offense for which Venable had served time in prison was a felony. (Moore Report, p. 1; *see* Tr. 39-40). In North Carolina, the majority of breaking and entering offenses are felonies. *See* N.C.G.S. §§ 14-52 (burglary), 14-53 (breaking out of dwelling house), 14-54(a) (breaking or entering any building with intent to commit felony or larceny therein), 14-54.1 (breaking or entering any building that is place of religious worship), and 14-56 (breaking or entering motor vehicles, boats, etc.).

Defendant argues that it was not reasonable for the officers to assume that Venable was a convicted felon based solely on these facts and that a criminal background check should have been performed to determine Venable's status. However, as noted, the standard for reasonable suspicion is quite low. It requires something more than a hunch, but it does not require absolute certainty. *Terry*, 392 U.S. at 27. Wood and Moore had specific, articulable facts–Venable's own statements and behavior–which, coupled with their experience as law enforcement officers, reasonably led them to suspect that Venable was a felon. The reasonable suspicion itself satisfies *Terry*; there is no requirement that the suspicion be confirmed prior to the stop. Indeed, to require confirmation would be to impose a higher standard than reasonable suspicion.

---

[4] In North Carolina, for misdemeanor sentences of less than ninety days, an individual would be sent to a local jail. N.C.G.S. § 15A-1352(a). For misdemeanor sentences greater than ninety days, an individual could be sent to either a state prison or to a local jail. *Id.* However, in order to receive a misdemeanor sentence of more than ninety days, an individual must have at least five or more prior convictions. N.C.G.S. § 15A-1340.23(c).

Furthermore, at the time Venable was cited for public urination, there was no need for further investigation into his background. (*See* Tr. 45, 48). The relevancy of Venable's criminal history did not arise until Venable approached and entered the van where the handgun had been spotted (*see id.* 48). At that point, there was insufficient time to perform a background check on Venable prior to his departure in the van.[5] (*See id.* 48-49). There is accordingly no evidence that the officers acted in bad faith or otherwise improperly in not obtaining a background check for Venable.

## C. Reasonable Suspicion that Venable Was or Would Be in Knowing Possession of a Firearm

Having determined that there was reasonable suspicion that Venable was a felon, the court now turns to the existence of reasonable suspicion that Venable was or would be in knowing possession of a firearm. Possession for purposes of 18 U.S.C. § 922(g)(1) does not require actual possession, that is, physical control over the firearm. *United States v. Scott*, 424 F.3d 431, 435 (4th Cir. 2005). Instead, an individual can be in constructive possession of a firearm, which occurs if he "exercises, or has the power to exercise, dominion and control over [it]." *Id.* (internal quotation marks omitted).

The record shows that the officers had sufficient information to support a reasonable suspicion that Venable was or would be in knowing, actual or constructive possession of the handgun once he walked up to the van in the parking lot. It is undisputed that the handgun was in the van at that time. Moreover, although the unlocked drawer in which the handgun was located was open only an inch, the gun was positioned in such a way that it was in plain view. In addition,

---

[5] Both Wood and Moore testified that they are not certified to perform criminal background checks and that their police vehicles are not equipped to make such checks. (Tr. 23-24, 42). The only way they could have performed a background check on Venable was to call the police station's main desk and request it. (*Id.* 13). Further, Wood stated that around that time of day (*i.e.*, 3:00 a.m.) the state system used for making such inquiries is usually down for re-booting and the main desk is very busy. (*Id.*).

10

Venable's interactions with Batchelor and defendant indicate that the three men were not strangers to each other, but were friends or well-known acquaintances. The apparent relationship between Venable and the others could reasonably be expected to facilitate Venable's physical access to the handgun and exchange of information about it.

It remained reasonable for the officers to suspect that Venable had or would obtain actual or constructive possession of the handgun during the five or so minutes that he and his companions lingered around the van after leaving the nightclub. Both Wood and Moore testified that they maintained constant surveillance of the van during this period and did not see the handgun being discarded or passed off to anyone outside the van. (*Id.* 33-34, 42-43). As a result, when Venable, Batchelor, and defendant departed in the van, there was reasonable certainty that the handgun was still in it. Venable was at that point in a closed, moving vehicle likely containing a firearm and accompanied by friends. Accordingly, the officers had strong justification to suspect that Venable had or would have knowing physical possession of the handgun or the knowing ability to possess or otherwise control it, and therefore that a criminal offense was being committed or would in the near future be committed.

Defendant argues that Venable's location in the van (the backseat) when it left the parking lot vis-a-vis the location of the handgun when it had last been seen by the police (under the front passenger seat) made it unreasonable for the officers to "assume [Venable] was the individual who had possessed the gun." (Def.'s Mot., p. 5). Defendant's argument errs by, among other things, ignoring the possibility of Venable's constructive possession of the handgun and presuming a level of certainty regarding suspected criminal activity simply not required by *Terry*. Again, the pivotal question under *Terry* is whether the police had sufficient evidence of possible future criminal activity

11

to warrant further investigation. *Perkins*, 363 F.3d at 326. Knowledge that a suspected felon was traveling through an urban area, with acquaintances, in a vehicle likely containing a handgun provided the officers here more than sufficient justification to stop the vehicle for further investigation.

## IV. CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant's motion to suppress be DENIED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten business days to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 8th day of June, 2007.

James E. Gates
United States Magistrate Judge